UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KRISTINA HORNADAY-ALBERTS, Plaintiff, | ) | |
| v. | ) | No. 1:25-cv-00337-JPH-TAB |
| REBECCA FRECHETTE, *et al.*, Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS TO DISMISS**

Kristina Hornaday-Alberts is disabled and used a Section 8 voucher administered by the Indianapolis Housing Agency ("IHA") to rent a home from Rebecca Frechette. Ms. Hornaday-Alberts requested accommodations in her rental home and a three-bedroom voucher from IHA to accommodate a live-in aide. She alleges that Defendants U.S. Department of Housing and Urban Development and its Secretary Scott Turner[1] (collectively "HUD"), IHA, Ms. Frechette, and CICOA Aging and In-Home Solutions violated federal and state law through actions related to her voucher and accommodations requests.

IHA, HUD, and Ms. Frechette have filed motions to dismiss. Dkts. [115]; [123]; [125]. For the reasons below, HUD's motion is **GRANTED**, IHA's motion is **DENIED**, and Ms. Frechette's motion is **DENIED**.

[1] Scott Turner became the Secretary of Housing and Urban Development in February 2025. Under Federal Rule of Civil Procedure 25(d), Scott Turner is therefore automatically substituted for Marcia Fudge as the Defendant in this suit.

## I. Facts and Background

Because Defendants have moved for dismissal under Rule 12(b)(1) and 12(b)(6), the Court accepts and recites "the well-pleaded facts in the complaint as true." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011); *see Ctr. for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014).

Ms. Hornaday-Alberts is a Caucasian woman with a disability. Dkt. 111 at 5, 43. She is unable to walk and is visually impaired. *Id.* at 5. The Family and Social Security Administration deems her to be an individual who requires a live-in-aide to live on her own. *Id.* at 6.

Since 2018, Ms. Hornaday-Alberts has received a two-bedroom Section 8 Voucher from IHA. *Id.* at 5. Every year since, she requested IHA approval for a live-in aide and a three-bedroom voucher to accommodate an aide. *Id.* at 9–10. From 2018 to 2024, IHA didn't grant this request or "issue [a] proper denial." *Id.* at 10. In May 2025, IHA approved her request, "contingent upon submission of the live-in aide's information and formal approval of the aide." *Id.* 15–16. Ms. Hornaday-Alberts found this approval "ineffective" because she couldn't hire a live-in aide without a bedroom for the aide, but couldn't rent a three-bedroom unit with a two-bedroom voucher. *Id.* at 16. Without a live-in aide, Ms. Hornaday-Alberts suffered physical injuries and cannot fully use and enjoy the rental property. *Id.* at 6, 9.

Ms. Hornaday-Alberts further alleges that IHA failed to properly calculate her income and deduct certain medical expenses, resulting in incorrect rent calculations. *Id.* at 11–15. IHA also failed to add funds to her Family Self Sufficiency ("FSS") account. *Id.* at 24. On one occasion, when Ms. Hornaday-Alberts was at IHA, she heard an IHA employee say that "We don't need no white people up in here stealing our benefits." *Id.* at 35. IHA official William Garrett also falsely told her not to communicate with staff because a cease-and-desist order was issued against her. *Id.* at 34.

From 2019 to 2024, Ms. Hornaday-Alberts used her voucher to rent a property owned by Ms. Frechette. *Id.* at 26, 29. Ms. Hornaday-Alberts requested that Ms. Frechette add accommodations like a wheelchair-accessible ramp and stair lift, but Ms. Frechette did not do so. *Id.* at 29–30. In June 2024, Ms. Frechette visited the home without telling Ms. Hornaday-Alberts, harassed her, and threatened to take her service animals. *Id.* at 31.

Ms. Hornaday-Alberts raises eight claims against IHA; four claims against Ms. Frechette; three claims against HUD; and three claims against CICOA. Dkt. 111 at 36–44 (operative complaint).[2] IHA, HUD, and Ms. Frechette have moved to dismiss all claims against them. Dkts. 115, 123, 125.

[2] The body of Ms. Hornaday-Alberts's complaint refers to defendants "Kimberly Wize" and "Yvonda Bean", but they are not named in the case caption and she doesn't assert claims against them. Dkt. 111 at 1, 4, 36–44. Accordingly, any claims against these individuals are dismissed without prejudice. *See* Fed. R. Civ. P. 10(a); *Myles v. United States*, 416 F.3d 551 (7th Cir. 2005) (to be properly considered a party a defendant must be "specif[ied] in the caption").

## II.
## Motion to Dismiss Standard

Defendants may move under Federal Rule of Civil Procedure 12(b)(1) to dismiss claims for lack of subject-matter jurisdiction and under Federal Rule of Civil Procedure 12(b)(6) to dismiss claims for "failure to state a claim upon which relief can be granted." When faced with a 12(b)(1) motion, the plaintiff "bears the burden of establishing that the jurisdictional requirements have been met." *Burwell*, 770 F.3d at 588–89. To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim is one that allows "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, a complaint "must allege enough details about the subject-matter of the case to present a story that holds together," *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021), "but it need not supply the specifics required at the summary judgment stage." *Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021).

Under both 12(b)(1) and 12(b)(6), the Court will "accept the well-pleaded facts in the complaint as true," but will not defer to "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley*, 671 F.3d at 616; *see Burwell*, 770 F.3d 586 at 588–89.

Indiana substantive law governs this case's state-law claims. *See Webber v. Butner*, 923 F.3d 479, 480–81 (7th Cir. 2019). Absent a controlling decision from the Indiana Supreme Court, the Court does its best to predict how that court would rule on the issues of law. *Mashallah, Inc. v. West Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021). In doing so, the Court may consider decisions from the Indiana Court of Appeals. *See id.*

## III.
## Analysis

### A. HUD's motion to dismiss

The Section 8 voucher program that Ms. Hornaday-Alberts used is funded by HUD and administered by public housing agencies ("PHAs") like IHA. 24 C.F.R. § 982.1(a)(1). If a PHA substantially defaults on its obligations, HUD may take possession of the PHA under 42 U.S.C. § 1437d(j)(3)(A)(iv). Here, the parties agree that HUD took possession of IHA in April 2024 and appointed new IHA officials. Dkt. 124 at 3 n.2; dkt. 111 at 4. Ms. Hornaday-Alberts alleges that HUD-appointed IHA officials denied her voucher requests and miscalculated her rental assistance. Dkt. 111 at 10, 16, 34.

HUD argues that Ms. Hornaday-Alberts lacks standing to pursue the claims against it raised in the operative complaint. Dkt. 124 at 7. The "irreducible constitutional minimum" of standing consists of three elements: "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S.

330, 338 (2016). HUD contends that traceability is absent because, under a federal statute, Ms. Hornaday-Alberts's alleged injuries are traceable only to IHA, not HUD. Dkt. 124 at 7–9. Ms. Hornaday-Alberts responds that her injuries are traceable to HUD because it retained "ultimate authority" over IHA and appointed the IHA officials who injured her. Dkt. 137 at 2.

For traceability, an injury must be "fairly traceable" to the defendant's conduct, and "not the result of an independent action" of another party. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). If the plaintiff cannot trace their injury to the defendant, the "court has no subject-matter jurisdiction to adjudicate [plaintiff's] claim, and the case must be dismissed." *Johnson v. Merrill Lynch, Fenner & Smith, Inc.*, 719 F.3d 601, 607 (7th Cir. 2013).

Federal regulations address HUD's liability when the Secretary takes possession of a PHA:

> If the Secretary . . . takes possession of a public housing agency . . . the Secretary . . . **shall be deemed to be acting not in the official capacity of that person or entity, but rather in the capacity of the public housing agency,** and any liability incurred, regardless of whether the incident giving rise to that liability occurred while the Secretary . . . was in possession of all or part of the public agency . . . shall be the liability of the public housing agency.

42 U.S.C. § 1437d(j)(3)(H) (emphasis added). Under this language, HUD was not acting in its own capacity when in possession of IHA or when appointing IHA officials. Instead, HUD's actions were done solely "in the capacity of [IHA]." § 1437d(j)(3)(H).

Ms. Hornaday-Alberts's alleged injuries were therefore—by statute—caused only by individuals acting "in the capacity of" IHA, and not HUD. *See*

42 U.S.C. § 1437d(j)(3)(H); *Greene v. Philadelphia Housing Auth.*, 789 F. Supp. 2d 582, 585 n.2 (E.D. Penn. 2011) ("[T]he clear purpose of [§ 1437d(j)(3)(H)] is to separate the actions undertaken while managing a troubled housing authority from official HUD actions, and to prevent the authority's actions from being attributed to HUD."); *Walker v. Woods*, No. 10–4267, 2011 WL 2637328, at *3 (W.D. La. July 6, 2011) (finding that under § 1437d(j)(3)(H), the alleged wrongdoing was committed by the PHA, an "entity separate from HUD").

Because Ms. Hornaday-Alberts's alleged injuries resulted from IHA's actions—not HUD's—she at most alleges a causal connection to HUD through "the independent action of some third party." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). That is insufficient to establish traceability. *Id.*; *Segovia v. United States*, 880 F.3d 384, 388–89 (7th Cir. 2018) (traceability was lacking when the injuries were caused by a state's decision, not a decision by the federal government). HUD's motion to dismiss is **GRANTED**, and the claims against it must be **dismissed without prejudice** for lack of standing.[3]

[3] Even if § 1437d(j)(3)(H)'s language didn't preclude traceability, it grants HUD immunity by providing that "any liability incurred . . . shall be the liability of the public housing agency." *See Smith v. V.I. Housing Auth.*, No. 09-cv-00011, 2011 WL 285858, at *3–5 (D.V.I. Jan. 28, 2011) (finding that HUD and the receiver appointed to possess a PHA were immune from suit under § 1437d(j)(3)(H)); *Walker*, 2011 WL 2637328, at *3 (granting HUD's motion to dismiss because of the sovereign immunity found in § 1437d(j)(3)(H)). Because Ms. Hornaday-Alberts lacks standing, the Court need not resolve HUD's motion based on immunity or address its remaining arguments for dismissal. *See* dkt. 124 at 10–19.

**B. IHA's motion to dismiss**

Ms. Hornaday-Alberts raises eight claims against IHA, alleging violations of her procedural due process rights, the U.S. Housing Act, and HUD and IHA's administrative policies; failure to accommodate her disability; retaliation; racial discrimination; and breach of contract. Dkt. 111 at 36–44.

**1. Procedural due process claims (Count 1)**

Ms. Hornaday-Alberts claims that IHA violated her due process rights when it failed to issue her a three-bedroom voucher and maintain funds in her FSS account. Dkt. 111 at 9–10, 24, 36–37. Procedural due process claims require "(i) a deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Sherwood v. Marchiori*, 76 F.4th 688, 694 (7th Cir. 2023).

**a. Three-bedroom voucher**

Ms. Hornaday-Alberts currently receives a two-bedroom voucher from IHA. Dkt. 111 at 36. For several years, she requested a three-bedroom voucher to allow for a live-in aide, but IHA "refused to issue" one. *Id.* at 10. Ms. Hornaday-Alberts asserts that IHA denied her due process by failing to provide notice, a written decision, and "appeal rights for an informal hearing," when it didn't issue the voucher. *Id.* at 10, 36.

IHA argues that Ms. Hornaday-Alberts had no protected property interest in a three-bedroom voucher because she was not entitled to it without first identifying a live-in aide and has "no cognizable property interest" in a specific dwelling. Dkt. 116 at 7–8. Ms. Hornaday-Alberts responds that as a

voucher recipient, she has a protected property right in "a properly sized voucher necessary to accommodate a live-in aide." Dkt. 126 at 8.

A protectable property interest is a "legitimate claim of entitlement" that "usually arise[s] from rights created by state statutes, state or municipal regulations or ordinances, and contracts with public entities." *Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 773–74 (7th Cir. 2021). Here, under IHA's policies, it "must approve a live-in aide if needed as a reasonable accommodation," and "[l]ive-in aides will be allocated a separate bedroom." Dkt. 111 at 9 (citing 2019 IHA HCV Administrative Plan ch. 3 § I.M). Ms. Hornaday-Alberts alleges that she provided the "necessary documentation" from her doctors showing that a live-in aide was a necessary accommodation. Dkt. 111 at 9–10. She has therefore alleged that she followed IHA's policies as required for "a live-in aide . . . as a reasonable accommodation" and the accompanying additional bedroom. *Id.* (citing 2019 IHA HCV Administrative Plan ch. 3 § I.M); *cf. Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) ("A property interest of constitutional magnitude exists only when the state's discretion is 'clearly limited' such that the plaintiff cannot be denied the interest 'unless specific conditions are met.'").

IHA's argument that it had discretion to deny Ms. Hornaday-Alberts's requests because she was required to identify an aide does not require dismissal of her due process claim at this stage. Dkt. 116 at 7. IHA relies on its policy for approving new household members, which states in relevant part that it will approve a new household member if it "determines an individual

meets IHA's eligibility criteria or documentation requirements." *Id.*; dkt. 111 at 18 (citing 2019 IHA HCV Administrative Plan § 11-II.B). Accepting that this part of the policy generally required Ms. Hornaday-Alberts to identify the specific person who would be her live-in aide, however, does not necessarily foreclose a protected property interest. Ms. Hornaday-Alberts also pleads that, under the policy, IHA "must approve a live-in aide if needed as a reasonable accommodation," and the limited portions of IHA's policies in the pleadings and addressed in IHA's argument do not show whether a specific aide must be identified in advance under that mandatory reasonable-accommodation provision. *See* dkt. 111 at 9; *Teva Pharma. USA, Inc. v. Eli Lilly & Co.*, 181 F.4th 756, 767 (7th Cir. 2026) (The "burden of persuasion lies with the moving party . . . to show an entitlement to dismissal.").

Ms. Hornaday-Alberts also pleads that she provided documentation from her doctors that she needed a live-in aide and that IHA officials later "approved [her] reasonable accommodation for a live-in aide," though they "still only issued a two-bedroom voucher." Dkt. 111 at 6, 16. Those alleged actions are enough to plead a "cognizable property interest" at this stage based on "rules or mutually explicit understandings that support [her] claim of *entitlement* to the benefit." *Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017) ("'[P]roperty' denotes a broad range of interests that are secured by existing rules or understandings.").

Last, IHA contends that individuals do not have a property interest in a specific dwelling. Dkt. 116 at 7. That argument does not support dismissal

because Ms. Hornaday-Alberts isn't seeking a specific three-bedroom unit or dwelling, but a three-bedroom voucher.

IHA's motion to dismiss this claim is therefore **denied**. *See Forgue*, 873 F.3d at 970 (reversing dismissal because plaintiff alleged a legitimate claim of entitlement to a benefit despite a policy allowing discretion).

**b. FSS escrow account**

Ms. Hornaday-Alberts alleges that she signed a contract with IHA to establish an FSS escrow account on her behalf. Dkt. 111 at 22. Under the contract, IHA was to place income in her account and maintain those funds, which she would eventually receive. *Id.* She alleges that IHA failed to add and maintain funds as required, depriving her of protected property without due process. *Id.* at 23–24, 36–37. IHA argues that these allegations fail to state a claim because Ms. Hornaday-Alberts alleged "only that funding to which she was entitled was *withheld*," not that she was deprived of it without process. Dkt. 116 at 9 (emphasis in original). Ms. Hornaday-Alberts responds that she alleged insufficient process by asserting that IHA mismanaged her funds without notice of the "factual and legal basis" for the decision. Dkt. 126 at 16.

Ms. Hornaday-Alberts alleges the deprivation of protected property (her FSS funds) and inadequate state process (no written basis for decision). Dkt. 111 at 24, 36. While IHA argues that she alleges only a withholding of benefits, a "temporary, nonfinal deprivation of property is nonetheless a deprivation in terms of the Fourteenth Amendment." *Fuentes v. Shevin*, 407 U.S. 67, 85 (1972). IHA also questions whether the deprivation occurred due to an

established state procedure; but even if it did not, Ms. Hornaday-Alberts can still be entitled to some process. *See Cannici v. Vill. of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018) ("[A] claim based on a random and unauthorized acts by state officials" still requires "meaningful post-deprivation" remedies).

IHA's motion to dismiss this claim is therefore **denied**.[4]

**2. Municipal liability claims under § 1983 (Counts 1, 2)**

Because IHA is a municipal entity, it is liable under § 1983 only if its "policy or custom caused the constitutional injury." *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993); *see Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978). IHA argues that Ms. Hornaday-Alberts's municipal liability claims must be dismissed because she has not sufficiently alleged a policy, practice, or custom. Dkt. 116 at 5–6. Ms. Hornaday-Alberts responds that officials involved were *de facto* policymakers and that she alleged a "long-standing practice or policy that was repetitious and occurred over many years." Dkt. 126 at 4–8.

"[A] widespread practice that is so permanent and well-settled that it constitutes a custom or practice" can support *Monell* liability. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022). Ms. Hornaday-Alberts alleges that IHA applied such a "longstanding practice or policy" when it did not approve her voucher requests from 2018 to 2025. Dkt. 111 at 37. She also alleges that multiple IHA personnel were involved. *Id.* at 13–14 (listing five

---

[4] Ms. Hornaday-Alberts also alleges that IHA improperly calculated her two-bedroom voucher assistance without due process, dkt. 111 at 10–11, 36–37, but IHA does not argue that these allegations fail to state a due process claim, *see* dkt. 116 at 5–10.

IHA officials involved). These allegations of IHA employees' long-term actions plausibly allow a reasonable inference of a widespread practice. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) ("If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible . . . to infer that there is a policy at work.").

IHA resists this conclusion by arguing that Ms. Hornaday-Alberts cannot rely on only her own circumstances to allege a widespread practice. Dkt. 116 at 5–6. At this pleadings stage, however, Ms. Hornaday-Alberts is not required to include allegations beyond her own experience. *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (stating that an individual pleading a *Monell* claim is "not required to identify every other or even one other individual" who had been affected by the alleged unconstitutional practice).

IHA's motion to dismiss the § 1983 claims on this ground is **denied**.[5]

**3. Failure-to-accommodate claims (Counts 3, 4)**

Ms. Hornaday-Alberts asserts failure-to-accommodate claims under the Fair Housing Act ("FHA"), Americans with Disabilities Act ("ADA"), and Rehabilitation Act, which require IHA to provide "reasonable" accommodations that are "necessary to afford [a covered] person equal opportunity to use and enjoy a dwelling."[6] *Oconomowoc Residential Programs v. City of Milwaukee*, 300

[5] The Court therefore does not address whether a final policymaker was responsible for the deprivations. *See Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 724 (7th Cir. 2025) (stating that if a "plaintiff states a plausible claim for relief under one discernable legal theory" a federal court "start[s] and end[s] there").
[6] The Court does not understand Ms. Hornaday-Alberts to allege intentional discrimination claims under these statutes, but IHA argues that any claims must be dismissed. Dkt. 116 at 13–15. Ms. Hornaday-Alberts does not respond to that

F.3d 775, 782–83 (7th Cir. 2002) (applying same standard across all three statutes). Ms. Hornaday-Alberts alleges that from 2018 to 2025, IHA failed to grant her accommodation requests for a live-in aide and additional bedroom. Dkt. 111 at 6, 9–10, 37–39.

IHA argues that these claims must be dismissed because it accommodated Ms. Hornaday-Alberts's aide request when it approved an aide in May 2025, and because it would not be reasonable or necessary to modify its rule requiring identification and approval of an aide before issuing an additional bedroom voucher. Dkt. 116 at 15–17. Ms. Hornaday-Alberts responds that she alleged reasonable accommodation requests necessary to address the housing barriers created by her disability. Dkt. 126 at 23–26.

An accommodation is "necessary" if it "will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 968 (7th Cir. 2018). Ms. Hornaday-Alberts alleges that she cannot take care of her basic needs without a live-in aide and could not identify or hire one without an additional bedroom. Dkt. 111 at 6; *see Valencia*, 883 F.3d at 968 (explaining that "the key inquiry" for necessity is "asking whether the rule in question, if left unmodified hurts [disabled] people *by reason of their [disability]*.") (emphasis in original). These allegations give "enough details" about Ms. Hornaday-Alberts's need for the requested accommodations to "present a story that holds together." *Swanson*

argument, so she so she has "abandoned the claim" and may no longer pursue it. *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008).

*v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010); *see Valencia*, 883 F.3d at 968. Moreover, as discussed above for the due process claim, it is not established at this stage that IHA's policies prevent approval of an aide as a reasonable accommodation in this situation. The parties' dispute about whether such an accommodation would be reasonable therefore must wait. *Wis. Cmty. Serv., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006) (Whether an accommodation is reasonable is a "highly fact-specific inquiry and requires balancing the needs of both parties.").

IHA next argues that it accommodated Ms. Hornaday-Alberts's disability by granting her request for an aide in May 2025. Dkt. 116 at 15. Granting a request after a six-year delay, however, is not fatal to this claim because "an unreasonable delay in providing accommodations for a known disability can amount to a failure to accommodate [the] disability." *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020) (reversing 12(b)(6) dismissal because a factfinder could find an eleven-month delay followed by an accommodation approval to be unreasonable).

Finally, IHA argues that the Rehabilitation Act and ADA claims must be dismissed because Ms. Hornaday-Alberts was not denied access to the housing program. Dkt. 116 at 13. But "refusing to make reasonable accommodations is tantamount to denying access," so her allegations that IHA refused

accommodations are sufficient. *McDaniel v. Syed*, 115 F.4th 805, 823 (7th Cir. 2024).[7] IHA's motion to dismiss the failure-to-accommodate claims is **denied.**

#### 4. Retaliation claims (Count 5)

Ms. Hornaday-Alberts claims retaliation in violation of the FHA, Title VI, Rehabilitation Act, § 1981 and/or § 1983[8], alleging that one day after she requested accommodations from IHA, its CEO/Executive Director, William Garrett, falsely told her that a cease-and-desist order was issued "to prevent her from emailing" IHA staff about her requests. Dkt. 111 at 34, 42. These claims require Ms. Hornaday-Alberts to "show that: (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two." *Wetzel v. Glen St. Andrew Living Comm., LLC*, 901 F.3d 856, 868 (7th Cir. 2018) (FHA); *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (§ 1981 and Title VI); *Lewis v. Ind. Dept. of Transp.,* 173 F.4th 876, 882 (7th Cir. 2026) (Rehabilitation Act).

IHA argues that Ms. Hornaday-Alberts failed to allege an adverse action because its actions, at most, show rudeness, shunning, and ostracism; and its actions were not causally related to the accommodation requests. Dkt. 116 at 19–20. Ms. Hornaday-Alberts responds that IHA's false statement about a

---

[7] Because Ms. Hornaday-Alberts's FHA failure-to-accommodate claim is not subject to dismissal under § 3604(f), the Court need not address IHA's argument that § 3604(a) does not apply to post-acquisition discrimination, dkt. 116 at 12. *See Funding, LLC*, 136 F.4th at 724 (stating that if a "plaintiff states a plausible claim for relief under one discernable legal theory" a federal court "start[s] and end[s] there").

[8] IHA argues that the § 1983 claim must be dismissed because Ms. Hornaday-Alberts did not allege municipal action for *Monell* liability. Dkt. 116 at 17–18. Ms. Hornaday-Alberts's response does not address that argument, *see* dkt. 126 at 26–27, so she has "abandoned the claim" and may no longer pursue it. *Maclin*, 520 F.3d at 788.

cease-and-desist order in response to her accommodation requests supports a plausible retaliation claim. Dkt. 126 at 27.

For retaliation claims, an action is adverse if "a reasonable [person] . . . would be dissuaded from engaging in the protected activity." *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 475 (7th Cir. 2025). Ms. Hornaday-Alberts's allegation that she was falsely told that a cease-and-desist order was issued against her plausibly meets that standard because she was told that the order prevented her from engaging in further protected activities. *See id.*; *cf. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) (the purpose of Title VII's anti-retaliation provision is to prevent interference with "efforts to secure or advance enforcement of the Act's basic guarantees").

Even if these actions were only "shunning" and "ostracism," those things may qualify as an adverse action if they involve "material harm." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998). IHA doesn't contend that there was no material harm, *see* dkt. 126 at 19, and "taking all reasonable and favorable inferences" in Ms. Hornaday-Alberts's favor, she has plausibly pleaded that they impeded her ability to communicate about her accommodations. *See Teva Pharma.*, 181 F.4th at 767.

For the causation element, a plaintiff need not plead a causal link between protected activity and adverse action. *See Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013) (reversing dismissal of Title VII retaliation claim because the alleged the first two elements of a retaliation claim, which "is all [he] needed to do at that stage"). Moreover, Ms. Hornaday-

Alberts alleges that the adverse actions occurred only one day after her accommodation request. *See e.g. Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) (noting that an adverse action occurring one day or one week after the protected action could establish the required nexus).

IHA's motion to dismiss the retaliation claims is **denied** under the FHA, ADA, Rehabilitation Act, Title VI, and § 1981.

**5. Racial discrimination claims (Counts 6, 7)**

Section 1981 prohibits discrimination based on race in making and enforcing contracts. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Title VI similarly provides that "[n]o person in the United States shall, on the ground of race . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2001d.

Ms. Hornaday-Alberts claims that IHA violated those provisions when processing her Section 8 benefits, alleging that she heard an IHA employee say that "[w]e don't need no white people up in here stealing our benefits." Dkt. 111 at 35, 43. IHA argues that even if an IHA employee made the comment, Ms. Hornaday-Alberts did not allege that IHA leadership knew about and was deliberately indifferent to the comment. Dkt. 126 at 22. Ms. Hornaday-Alberts responds that she adequately alleged that IHA "failed to provide services and assistance" to her because of her race. Dkt. 126 at 27–28.

A plaintiff alleging race discrimination need "only to allege" that an adverse action occurred "because of [her] race." *Freeman v. Metro. Water*

*Reclamation Dist. Of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019); *see Collins v. Ctrs. for Medicare and Medicaid Servs.*, 24-2557, 2025 WL 599630, at *2 (7th Cir. Feb. 25, 2025) (reversing 12(b)(6) dismissal of a race discrimination claim on a plaintiff's bare allegations that hospital staff prevented her from visiting her mother because they "falsely portrayed [her] as an angry black female"). Under this low pleading standard, Ms. Hornaday-Alberts needed to allege only that IHA discriminated against because of her race, and she did so here. Dkt. 111 at 43 (alleging that IHA "failed to provide services and assistance to [her] based on her race" and discriminated against her "based on race in processing her Section 8 vouchers."). While IHA argues that she did not allege deliberate indifference to the comment she heard, pleading IHA's "actual knowledge of the discrimination" and "authority to address [it]" are not required. *Su v. E. Ill. Univ.*, 565 F. App'x 520, 521–22 (7th Cir. 2014).

IHA's motion to dismiss these race discrimination claims is **denied**.

**6. Breach of contract claims (Count 8)**

The FSS program enables HUD-assisted individuals to increase their income while reducing their dependence on public assistance. Dkt. 111 at 21. Once an individual is "selected to participate" in the FSS program, they enter into a contract with a PHA, like IHA. 24 C.F.R. § 984.303(a). That contract requires the PHA to place "an amount equal to any increase in the amount of rent paid by the family . . . that is attributable to increases in earned income by the participating family" into an "interest-bearing escrow account established

by the eligible entity on behalf of the participating family." 42 U.S.C. § 1437u(e)(2).

Ms. Hornaday-Alberts alleges that she signed a five-year contract in 2019 with IHA to establish an FSS account, but that IHA failed to place her disallowed income into her account and maintain those funds, leaving her account with no money. Dkt. 111 at 24–25. IHA argues that the breach of contract claim must be dismissed because there are no allegations of an offer or consideration. Dkt. 116 at 25. Ms. Hornaday-Alberts responds that her consideration was her employment under the terms of the program. Dkt. 126 at 28.

The Court must apply Indiana law by doing its best to predict how the Indiana Supreme Court would rule on the issues of law. *Mashallah*, 20 F.4th at 319. In Indiana, breach of contract claims require proof that: "(1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Tr. of Ind. Univ. v. Spiegel*, 186 N.E.3d 1151, 1158 (Ind. Ct. App. 2022). A valid contract requires "offer, acceptance, consideration, and a manifestation of mutual assent." *Id.*

Ms. Hornaday-Alberts alleged an offer by asserting that she signed a five-year contract with IHA to establish an FSS account. Dkt. 111 at 24. While IHA argues that she didn't allege that she was "selected into the program," her allegations that she signed a contract and has an FSS account plausibly support a reasonable inference that she entered the program. *Orgone Cap. III,*

*LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019) (at the pleading stage, plaintiffs receive "the benefit of all reasonable inferences").

IHA next argues that Ms. Hornaday-Alberts failed to plead consideration because "she presents no allegation of something of value, or a forbearance, that she gave in return" for IHA's obligation. Dkt. 116 at 25. But Ms. Hornaday-Alberts alleged that she started working in 2020 under the FSS program's rules, dkt. 111 at 24, which alleges a detriment to her that is enough to plead consideration at this stage. *See Ind. Dept. of State Rev. v. Belterra Resort Ind., LLC*, 935 N.E.2d 174, 179 (Ind. 2010) ("To constitute consideration, there must be a benefit accruing to the promisor **or** a detriment to the promisee.") (emphasis added).

IHA's motion to dismiss Ms. Hornaday-Alberts's breach of contract claim is therefore **denied**.

**C. Ms. Frechette's motion to dismiss**

Ms. Hornaday-Alberts raises claims against her former landlord, Ms. Frechette, for failing to accommodate her disability; retaliation; interference; and breach of contract. Dkt. 111 at 38–44.

**1. Failure-to-accommodate claims (Counts 3, 4)**

Both the FHA and Rehabilitation Act allow discrimination claims based on a failure to provide reasonable accommodations. *Valencia*, 883 F.3d at 966–67 (citing 42 U.S.C. § 3604(f)(3)(B) and 29 U.S.C. § 794(a)). A plaintiff must show that: "(1) the plaintiff had a disability; (2) the defendant was aware of the disability; and (3) the defendant failed to reasonably accommodate the

disability." *Watters v. Homeowners' Ass'n at Preserve at Bridgewater*, 48 F.4th 779, 789 (7th Cir. 2022) (FHA); *Valencia*, 883 F.3d at 966 ("the same analysis" applies under the FHA and Rehabilitation Act).

Ms. Frechette argues that Ms. Hornaday-Alberts has not stated failure-to-accommodate claims because her accommodation request allegations are "unsupported." Dkt. 125-1 at 4, 16–17. Ms. Frechette also contends that, regardless, she is exempted from liability for discriminatory FHA violations as a single-family homeowner. *Id.* at 14–15. Ms. Hornaday-Alberts responds that she has plausibly alleged a failure to make accommodations to the home, so Ms. Frechette is not entitled to dismissal. Dkt. 138 at 5–6, 9–10. She further argues that, as an affirmative defense, the FHA exemption would entitle Ms. Frechette to dismissal only if the complaint established that the affirmative defense applies, which it does not. *Id.*

Ms. Hornaday-Alberts alleges that she requested accommodations like a wheelchair ramp, a stairlift, and grab bars and that Ms. Frechette refused to make those accommodations. Dkt. 111 at 29–30. That suffices to state failure-to-accommodate claims. *See Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012) (a complaint "cannot be dismissed under Rule 12" if it "invokes a recognized legal theory" and "contains plausible allegations on the material issues"). Ms. Frechette's argument that Ms. Hornaday-Alberts must also allege "details as to when these purported requests were made," dkt. 125-1 at 16–17, demands too much at the pleading stage. *See Teva Pharm. USA*, 181 F.4th at 767 (reversing 12(b)(6) dismissal because defendant's argument that the

plaintiff must allege "an exact date" of an event "demanded more than plausibility").[9]

Nor does the FHA single-family-homeowner exemption require dismissal of the FHA failure-to-accommodate claim at this stage. The FHA's anti-discrimination provisions, 42 U.S.C. § 3604, do not apply to "any single-family house sold or rented by an owner" who "does not own more than three such single-family houses at any one time." 42 U.S.C. § 3603(b)(1). This exemption is an affirmative defense, so dismissal is proper only when the "factual allegations in the complaint unambiguously establish all the elements of the defense." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016); *Ho v. Donovan*, 569 F.3d 677, 682 (7th Cir. 2009). Here, Ms. Hornaday-Alberts alleges that Ms. Frechette "currently owns, owned and/or sold at least four (4) properties," dkt. 111 at 42, so the affirmative defense's elements are not established by the complaint. Ms. Hornaday-Alberts therefore has not "pleaded [her]self out of court" on this basis. *See Hyson USA, Inc.*, 821 F.3d at 939.

Ms. Frechette's motion to dismiss the failure-to-accommodate claims is **denied.**

### 2. Retaliation claims (Counts 5)

Both the FHA and Rehabilitation Act prohibit retaliation against an individual who exercises rights conferred by those statutes. *See Wetzel*, 901 F.3d at 868 (FHA) (citing 42 U.S.C. § 3617); *Stanek v. St. Charles Comm. Unit*

[9] Ms. Frechette argues that she installed grab bars to accommodate Ms. Hornaday-Alberts and allowed her to stay despite unpaid rent, dkt. 125-1 at 17, but the Court must take Ms. Hornaday-Alberts's allegations as true. *See Swanson*, 614 F.3d at 404.

*Dist. No. 303*, 783 F.3d 634, 641 (7th Cir. 2015) (Rehabilitation Act). Ms. Hornaday-Alberts alleges that after she requested accommodations, Ms. Frechette threatened to take her service animals; "disallowed" her from receiving aid for accommodations; and filed complaints against her with HUD, IHA, and the Social Security Administration. Dkt. 111 at 30–33, 41–42.[10]

Ms. Frechette argues that these allegations do not plausibly plead retaliation because they do not allege that Ms. Frechette's conduct was causally related to the accommodation requests. Dkt. 125-1 at 19–20.[11] Ms. Hornaday-Alberts responds that she plausibly pleaded retaliation because Ms. Frechette threatened to remove her service animals and engaged in other adverse behavior after the accommodation requests. Dkt. 138 at 8–9.

Retaliation claims under these statutes require a plaintiff "to show that: (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two." *Wetzel*, 901 F.3d at 868 (FHA); *Lewis,* 173 F.4th at 882 (Rehabilitation Act). At the pleadings stage, however, Ms. Hornaday need not explicitly allege a causal nexus. *See Luevano*,

---

[10] Ms. Hornaday-Alberts also asserts retaliation claims under Title VI and "§ 1981 and/or § 1983." Dkt. 111 at 41–42. Ms. Frechette argues that, substantively, the claims against her arise only under the FHA and Rehabilitation Act. Dkt. 125-1 at 18. Ms. Hornaday-Alberts doesn't respond to that argument, *see* dkt. 138 at 7, so she has "abandoned the claim[s]" brought under the other statutes and may no longer pursue them. *Maclin*, 520 F.3d at 788.

[11] Ms. Frechette argues that her actions "reflect a landlord anxious about the state of their [p]roperty" instead of retaliation. Dkt. 125-1 at 19. At this stage, however, the Court must take Ms. Hornaday-Alberts's allegations as true, and they plausibly allege adverse actions. *See Swanson*, 614 F.3d at 404 (explaining that "plausibility" at the 12(b)(6) stage "does not imply that the district court should decide whose version to believe, or which version is more likely than not").

722 F.3d at 1029 (reversing dismissal because the plaintiff sufficiently plead the first two elements of a retaliation claim, which "is all [she] needed to do at that stage."). And she has pleaded protected activity (her accommodations requests) and adverse actions (including threats to remove her service animals and complaints against her with administrative agencies). Dkt. 111 at 32–33.

Ms. Frechette's motion to dismiss the retaliation claims is therefore **denied.** *See Luevano*, 722 F.3d at 1029.

**3. FHA interference claim (Count 3)**

Under § 3617 of the FHA, it is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, . . . any right granted or protected by" certain sections of the FHA. *Wetzel*, 901 F.3d at 868. Interference claims require a "plaintiff to show that: (1) she is a protected individual under the FHA; (2) she was engaged in the exercise or enjoyment of her fair housing rights; (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA; and (4) the defendants were motivated by an intent to discriminate. *Farhan v. 2715 NMA LLC*, 161 F.4th 475, 481 (7th Cir. 2025).

Ms. Frechette argues that Ms. Hornaday-Alberts's complaint "failed to prove *any* of these factors," and that a landlord-tenant dispute cannot form the basis for an interference clam. Dkt. 125-1 at 16, 19–20 (emphasis in original). Ms. Hornaday-Alberts responds that Ms. Frechette's refusal to provide

accommodations and her intimidating actions constitute interference. Dkt. 138 at 6.

Under the FHA, refusing to make reasonable accommodations constitutes discrimination. 42 U.S.C. § 3604(f)(3)(B). So, refusing accommodations, if done with discriminatory intent, can constitute interference with an individual's housing rights. *See* 24 C.F.R. § 100.400(c)(2); *see Bloch v. Frischholz*, 587 F.3d 771, 781 (7th Cir. 2009). Here, Ms. Hornaday-Alberts's allegations that Ms. Frechette refused accommodations, "disallowed" her from receiving aid for accommodations, and threatened to take her service animals allow for the plausible inference of discriminatory intent. Dkt. 111 at 30–31; *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Staples v. Paragon Sys., Inc.*, 607 F. App'x 569, 569 (7th Cir. 2015) (unpublished) (explaining that, under *Swierkiewicz* and Fed. R. Civ. P. 9(b), "[i]ntent may be pleaded generally . . . and it does not take much to allege discriminatory conduct").

Ms. Frechette nevertheless argues that landlord-tenant disputes do not constitute interference or retaliation. Dkt. 125-1 at 19–20 (citing *Farrar v. Eldibany*, 137 F. App'x. 910 (7th Cir. 2005) (unpublished)). *Farrar* held, however, that bare allegations of a "simple" dispute about utilities and rent were insufficient to allege interference because of race. 137 F. App'x. at 912. Here, by contrast, Ms. Hornaday-Alberts alleges that Ms. Frechette discriminated against her by failing to accommodate her disability and by interfering with accommodations she needed for her disability, which is enough

at this stage to plead an intentional "pattern of harassment." *Farrar*. 137 F. App'x. at 912.[12]

Ms. Frechette's motion to dismiss the FHA interference claim is **denied.**

**D. Breach of contract claim (Count 9)**

In 2019, Ms. Frechette signed a Housing Assistance Payments ("HAP") Contract with IHA to rent her property to Ms. Hornaday-Alberts. Dkt. 111 at 11, 26–28. The contract established the monthly rent that Ms. Frechette may charge, *see id.*; dkt. 125-3 (HAP Contract), and Ms. Hornaday-Alberts alleges that Ms. Frechette breached this contract by increasing her rent. Dkt. 111 at 26–27. Ms. Frechette argues that Ms. Hornaday-Alberts cannot enforce this contract because she is not a party to it. Dkt. 125-1 at 20–21. Ms. Hornaday-Alberts responds that, under Indiana law, she may enforce the contract as a third-party beneficiary. Dkt. 138 at 14–15.

The Court must apply Indiana law by doing its best to predict how the Indiana Supreme Court would rule on the issues of law. *Mashallah*, 20 F.4th at 319. Under Indiana law, a non-party may enforce a contract "by demonstrating that [s]he is a third-party beneficiary to the contract." *Anon. Physician 1 v. White*, 153 N.E.3d 272, 278 (Ind. Ct. App. 2020). To enforce a contract as a third-party beneficiary, a plaintiff "must show (1) clear intent by

---

[12] While Ms. Frechette relies on *Farrar* in arguing that Ms. Hornaday-Alberts has not plausibly pleaded retaliation, *Farrar* concerns FHA interference so the Court addresses the argument here. *See* dkt. 125-1 at 19–20. Ms. Frechette also argues that Ms. Hornaday-Alberts did not "sufficiently put [Ms. Frechette] on notice of the statutory basis for this Claim against her" because she did not specify FHA subsections for each claim, dkt. 125-1 at 19, but plaintiffs need not "pin their claim for relief to any particular legal theory," *Zimmerman v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022).

the actual parties to the contract to benefit the third party; (2) a duty imposed on one of the contracting parties in favor of the third party; and (3) performance of the contract terms necessary to render the third party a direct benefit intended by the parties of the contract." *Id.*

Here, Ms. Hornaday-Alberts plausibly pleads that she may be a third-party beneficiary by alleging that Ms. Frechette and IHA signed the HAP Contract for the subsidization of her rent and to establish housing quality standards for her benefit. *See White*, 153 N.E.3d at 278; dkt. 111 at 11, 26–28. Ms. Frechette also has not shown at this stage that the HAP Contract excludes third-party recovery. *See* dkt. 144 at 10–12. The contractual language she relies on states that "the [tenant] is not a party to or a third party beneficiary of **Part B** of the HAP contract. The [tenant] may not enforce any provision of **Part B**." Dkt. 125-3 at 7 (emphases added).[13] So, unlike in the *Blevins* case Ms. Frechette relies on, *see Indiana Gaming Co., L.P v. Blevins*, 724 N.E.2d 274 (Ind. Ct. App. 2000), the pleadings do not establish that the contract language unambiguously precludes all third-party enforcement.

Ms. Frechette's motion to dismiss this claim is **denied**.[14]

---

[13] Ms. Frechette attached the HAP Contract to her brief, arguing that the Court may take judicial notice of it. Dkt. 125-1 at 5; dkt. 125-3. Ms. Hornaday-Alberts does not dispute the HAP contract and refers to it in her operative complaint. Dkt. 111 at 3; dkt. 138 at 12–13. The Court therefore considers the HAP contract at the pleadings stage without converting Ms. Frechette's motion into a Rule 56 motion for summary judgment. *See Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022).

[14] Ms. Hornaday-Alberts reply brief asserts a breach of implied warranty of habitability claim. Dkt. 138 at 11–12. But her operative complaint contains no such allegations, *see* dkt. 111, and "a plaintiff may not amend [her] complaint in [her] response brief." *Pirelli Armstrong Tire Corp. Retiree Med Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011), so the Court does not address these allegations.

## IV.
## Order to Show Cause

Ms. Hornaday-Alberts's response brief to Ms. Frechette's motion to dismiss, dkt. 138, includes non-existent quotations, misrepresented case holdings, and unverifiable record citations. For example, counsel cites *Harris v. Itzhaki* to show that the FHA's single-family home exemption is an affirmative defense, dkt. 138 at 9, but *Harris* does not discuss FHA exemptions or affirmative defenses, *see* 183 F.3d 1043, 1050 (9th Cir. 1999). Counsel also cites *Indianapolis-Marion Ctny. Public Lib. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, to argue that non-parties may enforce a contract, but that case discusses the economic loss rule in negligence actions, not non-party contractual enforcement. Even more, counsel quotes non-existent language from *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997), and to non-existent allegations in the operative complaint. Dkt. 138 at 10, 12, 14 (citing to pg. 47 ¶¶ 290–293 and pg. 48 ¶ 295 while the operative complaint ends at pg. 46 and ¶ 277).

These errors are a hallmark of artificial intelligence use without appropriate attorney engagement and verification. *See Dec v. Mullin*, 171 F.4th 940, 946–47 (7th Cir. 2026). But regardless of whether counsel used AI, she was required under Federal Rule of Civil Procedure 11(b) to certify that to the best of her knowledge, information, and belief, "the factual contentions have evidentiary support" and the "legal contentions are warranted by existing law or a nonfrivolous argument for extending, modifying, or reversing existing law or

for establishing new law." *Jones v. Kankakee Cnty. Sheriff's Dept.*, 164 F.4th 967, 970 (7th Cir. 2026) (applying Rule 11); *see Dec*, 171 F.4th at 947–48. Courts in this district have imposed sanctions when an attorney has cited nonexistent authority or misrepresented a case's holding. *See e.g., Mid. Cent. Operating Eng'rs Health & Welfare Fund v. HoosierVac LLC,* No. 2:24-cv-00236-JPH-MJD, 2025 WL 1511211, at *2 (S.D. Ind. May 28, 2025) ($6,000 sanction); *Virgil v. Experian Info. Sols. Inc.*, No. 1:25-cv-01641-MPB-MJD, 2026 WL 401066, at *4 (S.D. Ind. Mar. 10, 2026) ($10,000 sanction).

Ms. Hornaday-Alberts's counsel is therefore **ORDERED** to show cause by **October 14, 2026**, why sanctions should not be imposed for making misrepresentations to the Court in her response brief to Ms. Frechette's motion to dismiss, dkt. 138, in violation of Rule 11(b).

## V.
## Conclusion

HUD's motion to dismiss, dkt. [123], is **GRANTED** and the claims against it are **DISMISSED without prejudice**. The **clerk is directed to terminate as Defendants** Marcia Fudge (Scott Turner) and Housing and Urban Development. IHA's and Ms. Frechette's motions are **DENIED**. Dkt. [115]; dkt. [125].

Ms. Hornaday-Alberts's counsel is **ORDERED** to show cause by **October 14, 2026**, why sanctions should not be imposed for violations of Rule 11(b).

Magistrate Judge Baker is requested to set an appropriate schedule for the remainder of this case.

**SO ORDERED.**

Date: 9/15/2026

James Patrick Hanlon

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel